UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOEL NUNEZ,

    Plaintiff,

v.

D. BRIGHT, et al.,

    Defendants.

Case No. 17-cv-02034-RS (PR)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff alleges his doctors at CTF-Soledad violated his Eighth Amendment rights by denying him a lower bunk assignment, a prosthetic finger, and a job accommodation. Defendants move for summary judgment.[1] Because the undisputed material facts support defendants' motion, summary judgment will be granted in defendants' favor.

## BACKGROUND

The following facts are undisputed unless specifically noted otherwise. This suit arises from the loss of part of plaintiff's left ring finger on January 28, 2016. On that date at CTF-Soledad, plaintiff slipped and fell while climbing down from the top bunk in his

---

[1] Defendants provided plaintiff with the required warnings under *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998) (en banc). (Dkt. No. 29-1.)

cell. As he fell, his left ring finger was caught between his bunk and a piece of metal and part of it was torn off. (Compl., Dkt. No. 1 at 9-10.) The distal knuckle had been "traumatically amputated," exposing the bone from the first to the second knuckles. (MSJ, Friederichs Decl., Dkt. No. 23 ¶ 25.) Plaintiff was transferred to an off-site hospital. (*Id.*) Physicians there examined the injury and consulted with a clinic in San Francisco. (*Id.*) All the doctors decided against reattachment. (*Id.*) A doctor treated the finger by sawing the bone to his middle phalanx until it was possible to close the finger with the intact tissue. (*Id.*) He recommended that plaintiff receive a follow-up appointment with an orthopedic surgeon or a hand specialist. (*Id.*)

Upon plaintiff's return to the prison, defendants Friederichs, Lam, and Bright, all doctors, referred plaintiff to a hand surgeon, Dr. Zewert, who met with plaintiff three times. (*Id.* ¶ 26.) At none of these appointments did Zewert recommend that plaintiff should have a prosthetic finger. (*Id.*)

A prosthetic device is provided only when medically necessary, according to the policies of California Correctional Health Care Services. (*Id.* ¶ 27.) A medical necessity exists when a patient has an amputation or is missing a limb at the wrist or above. (*Id.*)

According to defendants, plaintiff's condition does not meet the standards for medical necessity. (*Id.*) Half his finger remains, which "satisfies his functional needs." (*Id.*) Prosthetic devices are not given for cosmetic purposes. (*Id.*)

In February 2016, Friederichs granted plaintiff a temporary lower bunk accommodation and ordered him to lift no more than 19 pounds during any job assignment. (*Id.*) In April 2016, a chrono was issued which restricted for 3 months any use of plaintiff's hand. (*Id.*, Bright Decl., Dkt. No. 25 ¶ 7.)

Also, in April 2016, plaintiff asked for (i) a job assignment that would not require the use of both his hands; and (ii) a prosthetic finger. (*Id.*) He explained that he was not able to use his left hand properly at his job in the kitchens because of the pain and that his job required him to handle heavy boxes. (*Id.*)

Plaintiff's request was reviewed by the Reasonable Accommodation Panel (RAP), of which defendant Bright was a member. (*Id.*) RAP granted plaintiff an accommodation permitting him to lift one lunch bag at a time. (*Id.*) In June 2016, plaintiff asked for other accommodations because working with one hand created additional pain and discomfort. (*Id.*) He asked (i) to be removed from his kitchen job; and (ii) for a prosthetic finger. (*Id.*) RAP denied his first request because there was no medical necessity for any further accommodation. (*Id.*)

The prosthetic finger requests were denied because missing part of his finger did not prevent access to programs or services. (*Id.*) Therefore, the requests were not ones for RAP to consider. (*Id.*)

In August 2016, Lam issued a permanent bottom bunk chrono. He also imposed a restriction that plaintiff lift no more than nineteen pounds. (*Id.*, Lam Decl., Dkt. No. 24 ¶ 17.)

Plaintiff contends defendants were deliberately indifferent to his safety and medical needs by not assigning him a lower bunk prior to the severing of his finger. Defendants contend that he never met the criteria for a lower bunk assignment. Bottom bunk assignments are usually given to those prisoners who have a severe vision impairment; severe orthopedic or mobility condition; a Body Mass Index (BMI) greater than 40, or a serious heart condition. (*Id.* ¶ 13.) Also, "physicians are not limited to the criteria, and could request a non-formulary accommodation for a condition not on the list." (Reply, Dkt. No. 36 at 2.) According to the undisputed record presented by defendants, at no time did plaintiff meet any of these criteria during his time at CTF-Soledad, nor did he present any signs outside the criteria that a lower bunk assignment was warranted.

**Friederichs**

Friederichs first met plaintiff in January 2011. (*Id.*, Friederichs Decl., Dkt. No. 23 ¶ 9.) Plaintiff complained of arthritis pain. (*Id.*) Friederichs diagnosed likely degenerative disc disease, and possible osteoarthritis in the right knee. (*Id.*) X-rays

showed no severe orthopedic conditions or any medical necessity for a bottom-bunk assignment. (*Id.*)

Friederichs also referred plaintiff to an ophthalmologist, who diagnosed cataracts and a bump (pterygium) in the left eye. (*Id.*) These vision impairments did not justify a bottom bunk chrono. (*Id.*) Friederichs asked that the bump and cataracts be removed. (*Id.*)

He next saw plaintiff in March 2011. (*Id.* ¶ 10.) Plaintiff complained of knee pain and swelling. (*Id.*) After examining him, Friederichs noted that he had full range of motion in the right knee, and that his straight leg raise was negative bilaterally, though the pain made raising his leg difficult. (*Id.*) Friederichs requested an MRI of the right knee, but plaintiff declined the referral. (*Id.*)

He next saw plaintiff in April 2011 for a follow up regarding the eye surgery and for a discussion of his knee pain. (*Id.* ¶ 11.) Plaintiff said that he had some blurry vision in his left eye. (*Id.*) Friederichs noted that plaintiff had equal symmetry in his legs, and diagnosed a possible meniscus tear in the right knee. (*Id.*) He also noted plaintiff's lower back pain, but saw no severe changes visible in the x-rays. (*Id.*)

He saw plaintiff twice in May 2011. (*Id.* ¶¶ 12 and 13.) He noted that plaintiff had equal symmetry and strength in his legs. (*Id.*)

He next saw plaintiff in November 2011 for a routine appointment. (*Id.* ¶ 14.) Plaintiff said he had been doing well; had lost some weight; and was not taking any pain medications. (*Id.*) He said he had occasional double vision in his left eye, though he was not experiencing it at the time of the appointment. (*Id.*) Friederichs told him to stay active and gave him lumbar exercises to perform. (*Id.*)

Plaintiff had an eye exam in January 2012. (*Id.* ¶ 15.) His uncorrected vision was 20/20 in his right eye, and 20/50 in his left eye. (*Id.*)

Friederichs next saw plaintiff in February 2012. (*Id.* ¶ 16.) He informed plaintiff that tests had shown that he had a newly reactive Hepatitis C antibody. (*Id.*) He noted that

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 17-cv-02034-RS
4

plaintiff had equal strength in his legs, and no edema. (*Id.*)

He next saw plaintiff in March 2012. (*Id.* ¶ 17.) They discussed the Hepatitis C lab results and Friederichs noted that plaintiff had equal strength in his legs, and no edema. (*Id.*)

He next saw plaintiff in August 2012 to discuss the possibility of a liver biopsy. (*Id.* ¶ 18.) He again noted that plaintiff had equal strength in his legs, and no edema. (*Id.*) His BMI was 30. (*Id.*)

He next saw plaintiff in February 2013. (*Id.* ¶ 19.) They discussed lab results. Plaintiff had gained 8 pounds and his BMI was 30, which Friederichs assessed as indicating mild to moderate obesity. (*Id.*)

In March 2013, it was noted during plaintiff's optometry exam that he was experiencing diminished vision in his left eye. (*Id.* ¶ 20.) Friederichs recommended an ophthalmology consultation, which was approved. (*Id.*) Plaintiff's uncorrected vision was 20/20 in his right eye, 20/70 in his left. (*Id.*)

He next saw plaintiff in June 2013. (*Id.* ¶ 21.) They discussed lab results. Plaintiff stated that he may be considered for early parole and wanted a liver biopsy before release. (*Id.*) He also asked for new eye glasses. (*Id.*) Friederichs noted that plaintiff's obesity had increased since his last visit. (*Id.*) He referred plaintiff to an optometrist, whom he saw in July 2013. (*Id.*)

Friederichs next saw plaintiff in October 2013. (*Id.* ¶ 22.) They discussed the results of the liver biopsy. (*Id.*) Plaintiff's BMI was 32. A weight-loss goal was set. (*Id.*)

He next saw plaintiff in March 2014. (*Id.* ¶ 23.) He believed that plaintiff likely had a chronic right medial collateral ligament sprain. (*Id.*) X-rays were ordered. (*Id.*)

He next saw plaintiff in June 2014. (*Id.* ¶ 24.) They discussed the x-ray results, which showed that the osseous structure was intact, no acute fracture or dislocation was seen, the joint spaces were well-preserved, the soft tissue was unremarkable, and no acute

osseous abnormalities were identified. (*Id.*) None of these results showed a severe orthopedic condition of the knee. (*Id.*) Plaintiff said that his right knee had been bothering him less lately. (*Id.*) This was the last time Friederichs saw plaintiff before January 28, 2016. (*Id.*)

### **Lam**

Defendant Lam first saw plaintiff in October 2014. (*Id.*, Lam Decl., Dkt. No. 24 ¶ 6.) They discussed plaintiff's Hepatitis C and his weight. (*Id.*) Plaintiff's BMI was 30 and was considered overweight. (*Id.*)

In January 2015, plaintiff asked to see an eye doctor because he needed a new pair of glasses. (*Id.* ¶ 7.) Lam sent a referral for an optometry exam, which defendant Bright approved. (*Id.*) In 2013, at the time of his prior exam, plaintiff's vision with corrective lenses was 20/30 in his right eye, and 20/70 in his left. (*Id.*) In June 2015, plaintiff was seen by an optometrist. (*Id.*) His uncorrected vision was 20/20 in the right eye, 20/200 in his left. (*Id.*)

Lam next saw plaintiff in April 2015. (*Id.* ¶ 8.) They again discussed his Hepatitis C. (*Id.*) His BMI was 30.5. (*Id.*)

Lam next saw plaintiff in October 2015. (*Id.* ¶ 9.) They discussed plaintiff's Hepatitis C and some recent lab results. (*Id.*) His BMI was 32.2, and there was nothing remarkable about his musculoskeletal system. (*Id.*)

In October 2015, plaintiff complained of chest pain. (*Id.* ¶ 10.) A nurse examined him. (*Id.*) He was asymptomatic for chest pain or dizziness at that time. (*Id.*) The nurse obtained an electrocardiogram (EKG) for him, consulted with Lam, and referred plaintiff for a follow-up appointment. (*Id.*)

On October 29, 2015, Lam met with plaintiff to talk about his chest pain episode and his Hepatitis C. (*Id.* ¶ 11.) Plaintiff stated that he had not experienced any more chest pain, and asserted that he felt fine after taking Naproxen. (*Id.*) He also stated that he had no shortness of breath, fatigue, visual change, or dizziness. (*Id.*) The EKG results showed

normal rhythm. (*Id.*) Lam detected a regular heart rate and rhythm, and no murmurs. (*Id.*) He noted that plaintiff ambulated well, and that his BMI was 32. (*Id.*) This was Lam's last encounter with plaintiff before the January 28, 2016 incident. (*Id.*)

**Bright**

Plaintiff premises Bright's liability on his failure to intervene. Bright was never his primary care physician, however, nor did he ever physically examine plaintiff. (*Id.*, Bright Decl., Dkt. No. 25 ¶ 5.) His involvement before the January 28, 2016 incident was to approve Lam's January 2015 optometry referral, and to sit on RAP when the accommodations were issued. (*Id.* ¶ 5.) To Bright, there was no indication that plaintiff's vision was so poor that a lower bunk chrono was warranted. (*Id.* ¶ 5.)

Plaintiff sees matters differently. He alleges he asked for a "lower bunk chrono" several times because "he was having great difficulties climbing onto and off his assigned [upper-level] bunk." (Compl., Dkt. No. 1 at 9.) He further alleges that Lam and Friederichs "made light of the fact that plaintiff needed a lower bunk chrono (made jokes)." (*Id.*) They also stated, "You have to fall and break something before you can get a lower bunk chrono" and "They don't give lower bunk chronos here." (*Id.*) According to plaintiff, Lam also said, "Even if I give you a lower bunk chrono, the Chief Physician [Defendant Bright] will disapprove it."[2] (*Id.*)

Plaintiff claims that defendants Friederichs, Lam, and Bright were deliberately indifferent to his serious medical needs when they (i) failed to issue a bottom-bunk chrono; (ii) declined to give him a prosthetic finger; and (iii) failed to remove him from his job.

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those

---

[2] "[Defendant Bright]" appears thusly in the original.

which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court is concerned only with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

**DISCUSSION**

**i.  Bottom-Bunk Chrono**

Plaintiff claims defendants violated his Eighth Amendment rights by failing to grant him a bottom-bunk chrono. He alleges he told them of his difficulties several times. Also, his various health problems should have put them on notice that he required such an assignment. By failing to give him a bottom bunk, they are at fault for the severing of his

finger.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (equating the standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

The Supreme Court has further clarified this standard by holding that "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A mere accident or evaluative mistake is not to be characterized as wanton infliction of unnecessary pain. *Estelle*, 429 U.S. at 105.

A plaintiff must show that his doctors or nurses embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*; *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

Defendants have presented undisputed evidence that at no time did plaintiff's medical condition indicate that he should have a bottom bunk. As the factual record shows, there was never an indication that plaintiff's alleged difficulties getting into or out

of his bunk were so severe as to warrant a bottom bunk accommodation. Not only are his allegations of difficulty conclusory and generalized ("had great difficulties climbing onto and off his assigned bunk"), there is no history of slips or falls, or even instances of near-slips or near-falls. Plaintiff ably got into and out of his upper bunk without injury (or even a near-injury) or accident from 2011, when he arrived at CTF-Soledad, to 2016, when he was injured.

Nor has plaintiff shown a genuine dispute of material fact that his health problems were grounds for issuing the chrono. Plaintiff had mild to moderate arthritis; disc degeneration (a normal development that comes with age); cataracts (which were removed); Hepatitis C; mild to moderate obesity; and a solitary incident of chest pain, which was investigated, never recurred, and did not indicate any serious or lasting condition. In fact, in many of his appointments, his doctors observed that he was ambulatory, had equal strength and symmetry in his legs, and had full range of motion in his arthritic knee. He also met none of the criteria for a bottom-bunk assignment. (Though the prison-created criteria are not dispositive of the issues in this case, that his doctors were on the look-out for such symptoms or maladies shows that they were assessing plaintiff's condition for various risks.)[3] He did not have a severe vision impairment, nor a severe

---

[3] Plaintiff contends that defendants cannot use prison or medical policies to "shield them from liability." (Pl.'s Opp., Dkt. No. 35 at 2.) This is true. In *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014), the Ninth Circuit held that prison officials and medical staff could still be held liable for deliberate indifference even if the denial of treatment was justified by a prison guideline or policy. But, the *Colwell* defendants had "ignored the recommendations of treating specialists" and relied on others "who made decisions based on an administrative policy." *Id.* at 1068. These facts are clearly distinguishable from those in the instant suit. Here, none of plaintiff's physicians thought his conditions warranted the issuance of a lower bunk chrono. They were not acting contrary to sound medical advice in deference to prison policy. Furthermore, the policy in *Colwell* was itself constitutionally offensive. The *Colwell* defendants denied the plaintiff, who was completely blind in one eye, cataract surgery because the prison policy declared that "one eye is good enough for prison inmates." *Id.* at 1063. Here, the rough guidelines about dispensing lower bunks are based on sound medical reasons: severe mobility, orthopedic, or vision impairments; a BMI greater than 40; or a severe heart condition. Also, "physicians are not limited to the criteria, and could request a non-formulary accommodation for a condition not on the list." (Reply, Dkt. No. 36 at 2.) This further supports defendants' position that they were not hiding behind a policy, but rather were

orthopedic or mobility condition. His BMI was always under 40 and he did not have a serious heart condition. Nor does the record show that plaintiff showed any signs outside the criteria that would indicate that a bottom bunk assignment was warranted.

Nothing in this record raises a genuine dispute of material fact that defendants knew that plaintiff faced "a substantial risk of serious harm" but "disregard[ed] that risk by failing to take reasonable steps to abate it." *Farmer*, 511 U.S. at 837. Furthermore, the record shows that the injury in January 2016 likely was the result of freakish circumstances, an accident, not the result of deliberate indifference. Defendants cannot be held liable for failing to foresee that plaintiff would slip and sever his finger. Defendants' motion for summary judgment is GRANTED on this claim.[4]

**ii. Prosthetic Finger**

Plaintiff claims defendants violated his Eighth Amendment rights when they failed to provide him with a prosthetic finger. He has not, however, shown a genuine dispute of material fact regarding this claim.

None of plaintiff's doctors thought a prosthetic finger was warranted. Plaintiff met none of the criteria (that is, an amputation from the wrist or above) and even the hand specialist, with whom plaintiff met three times, never recommended or even suggested that a prosthetic finger was needed or warranted.

Plaintiff has presented no competent medical evidence to dispute his doctors' determination. His disagreement with their course of treatment is not sufficient. A difference of opinion between a prisoner patient and a medical doctor is not enough to make out a violation of the Eighth Amendment. *Toguchi*, 391 F.3d at 1058-60. Rather, a

---

basing their decision on reasonable medical information.

[4] Plaintiff's case citations are unavailing. The facts in *Peralta v. Caire*, No. CV 05-3662-GHK (PLA), 2009 WL 3818761 (C.D. Cal. Sept. 15, 2009), a magistrate's report and recommendation that was adopted by the Court, are quite different. The *Peralta* plaintiff had a lower-bunk chrono, which prison guards refused to honor. Plaintiff Nunez's citation to a Second Circuit case is unavailing because such decisions are not binding on this Court.

plaintiff must establish that his doctors embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Id.* There has been no such showing. Defendants' motion for summary judgment on this claim is GRANTED.

### iii. Removal from Job

Plaintiff claims that defendants violated his Eight Amendment rights by failing to remove him from his job in the kitchens. Defendants' motion for summary judgment will be granted on this claim. First, medical personnel lack the authority to remove a prisoner from his or her job assignment. They may grant job-related accommodations, but the authority to terminate employment rests with the classification committee. "Any staff request for removal of an inmate from a program shall be submitted to the inmate's correctional counselor . . . The counselor shall refer the request to the classification committee for consideration and action." 15 Cal. Code Regs. § 3040(f).[5] This assignment of authority was made clear in the prison's responses to plaintiff's requests for removal. "Changes to work assignments or work status are out of the scope of a health care appeal. Therefore, only custody can change a work assignment or make a patient medically unassigned. If you wish to pursue this matter further, you will need to address this with your counselor." (Compl., Dkt. No. 1-12 at 9.)

Second, even if defendants had the authority to grant what plaintiff desired, the undisputed record shows that defendants granted plaintiff several important job-related accommodations in response to his complaints and condition. Friederichs temporarily restricted him from lifting anything weighing more than nineteen pounds, an accommodation later made permanent; he was prohibited from using his hand for three

---

[5] Work assignments, as opposed to termination decisions, are made by the classification committee or by specifically designated employees. Defendants were not those specifically designated employees. "Work assignments . . . may be made with or without the inmate's consent by the classification committee, a staff member designated as an inmate assignment lieutenant, or by a staff member responsible for the supervision of an unassigned inmate." 15 Cal. Code Regs. § 3040(g).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
CASE NO. 17-cv-02034-RS
12

months so that he could recover from his injury; and Bright directed that he be required to lift only one lunch bag at a time. That plaintiff was not granted the precise accommodation he wanted — no job at all — does not raise a genuine dispute of a material fact that his doctors were deliberately indifferent. They assessed his condition and decided on certain accommodations based on that condition. Plaintiff has presented no evidence showing that defendants embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Toguchi*, 391 F.3d at 1058-60.

Plaintiff states that even after the accommodation, he was "compelled to lift boxes of fruit that weighed more than nineteen pounds." (Opp., Dkt. No. 34 at 8.) This is unavailing. Defendants did not compel plaintiff to lift such boxes — his supervisors at work did. That his work supervisors failed to adhere to his doctors' orders cannot be held against defendants. Defendants' summary judgment motion is GRANTED as to the claim.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. (Dkt. No. 21.) Because plaintiff has not shown a genuine dispute as to any material fact, the Court need not consider whether defendants are entitled to qualified immunity. The Clerk shall terminate Dkt. No. 21, enter judgment in favor of all defendants as to all claims, and close the file.

**IT IS SO ORDERED.**

Dated: September 24, 2018

_____
RICHARD SEEBORG
United States District Judge